Lawrence KADISH, Malease Office Corp.,
Malease Food Corp., Malease 18 Corp.,
and FF Asset Corp., Appellants,

v.

PENNINGTON ASSOCIATES, L.P., Balk-
house Associates, L.P., and Aztex As-
sociates, L.P., Appellees.

No. 01–93–00517–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 14, 1995.

Dissenting Opinion on Grant of Rehearing
of Justice Hedges, Dec. 21, 1995.

Aubrey B. Calvin, John L. Verner, Brigid D. Ashcraft, Houston, for appellants.

Kathy D. Patrick, Jeffery J. Cotner, Houston, Allan Dinikoff, Daniel J. Friedman, New York City, for appellee.

## EN BANC OPINION ON MOTION FOR REHEARING

O'CONNOR, Justice.

We grant the motion for rehearing, withdraw our earlier opinion, and substitute this opinion in its stead.

The issue is whether the trial court properly dismissed for lack of jurisdiction on the defendant's plea to the jurisdiction. We hold it did not, and reverse and remand for further proceedings.

### Summary of the Facts

The controversy that gave rise to this suit arose from a series of tax shelter transactions, known as "sale-leaseback" arrangements, created and executed in 1983 and 1984 by Merrill Lynch subsidiaries. The transactions were designed to take advantage of favorable tax treatment under the then existing federal tax laws.

A Merrill Lynch subsidiary purchased a commercial office building on Waugh Drive in Houston, Texas from National Convenience Stores (NCS), who simultaneously entered into a leaseback arrangement and became the operating tenant. Merrill Lynch obtained mortgage financing for the purchase. It then formed Pennington Associates, L.P. (Pennington), a limited partnership whose units were offered and sold to investors. Pennington took an assignment of the lessor's interest in the NCS lease and assumed the responsibility of making the mortgage payments.

To obtain attractive tax advantages, Merrill Lynch had to insert additional parties between Pennington and NCS. Because they were both accrual basis taxpayers, Merrill Lynch could not obtain favorable tax treatment if Pennington entered into a direct lease with NCS. Deeming it necessary to place a cash basis taxpayer between the two accrual basis taxpayers, Merrill Lynch created a "master lease" arrangement in which a "sandwich lessee" would assume the role of Pennington's lessee and NSC's sub-lessor.

The sandwich lessee's incentive to invest in the transaction was the expectation of a substantial long-range profit. The rent schedule was set up so that the rent due at the beginning of the master lease was less than the amount necessary to service Pennington's mortgage payments. The sandwich lessee would have to make up the difference in the first years of the lease but would earn a sizeable return in the later years when the NCS rental payments would exceed the mortgage payments.

Merrill Lynch and Lawrence Kadish (Kadish) agreed to implement the master lease arrangement. Malease Office Corp., a nominally capitalized corporation owned by Kadish, acted as the sandwich lessee. FF Asset Corp. (FF Asset), another of Kadish's corporations, guaranteed Malease Office Corp.'s lease obligation in order to bolster its tax credibility. As a final step in the tax-driven plan, Kadish executed a guaranty agreement in which he pledged that the net worth of FF Asset would not fall below $2,000,000. In connection with the guaranty, Kadish executed a $2,000,000 unsecured demand note payable to FF Asset.

Aztex Associates, Ltd. (Aztex) is a Merrill Lynch sale-leaseback limited partnership for which Malease 18 Corp. is the sandwich lessee and FF Asset is the lease guarantor. The property covered by the lease consists of 18 cafeteria-style restaurants purchased from and leased back to K–Mart Company in Texas and other states. Malease Food Corp. serves as the sandwich lessee, and FF Asset as the lease guarantor, for the Balkhouse Associates, Ltd. (Balkhouse) sale-leaseback transaction for which the realty consists of various properties purchased from and leased back to the Kroger Company in Texas and other states. Kadish owns Malease 18 Corp. and Malease Food Corp. and guaran-

teed the net worth of FF Asset in the Aztex and Balkhouse transactions.

For several years, the Pennington transaction operated according to plan. The scheme unravelled in 1992, however, when NSC filed for bankruptcy, triggering a foreclosure of the office building by the mortgagee. When Malease did not pay the rental due May 6, 1992, Pennington terminated the master lease agreement and demanded that Malease and FF Asset make the required payment.

The operating tenants in the Aztex and Balkhouse transaction continued to perform. In October, 1992, Aztex and Balkhouse terminated payments to Kadish's companies because Kadish had breached his personal guaranty obligations in the Pennington transaction.

## The Lawsuits

Kadish filed a declaratory judgment action in Harris County against Pennington, citing the Texas Uniform Declaratory Judgment Act. TEX.CIV.PRAC. & REM.CODE ANN. §§ 37.001–.011 (1986 & Supp.1996). By his amended pleading, he sought declarations that:

(1) The Kadish guaranty was not enforceable against Kadish;

(2) Pennington's claims against Kadish arising from the Kadish guaranty were barred by limitations;

(3) Pennington's claims against Kadish arising from the Kadish guaranty were barred by laches.

Pennington filed an answer and counterclaim. In its counterclaim, Pennington requested a declaratory judgment that the Kadish guaranty was enforceable, citing TEX. CIV.PRAC. & REM.CODE ANN. § 37.004 (1986). After filing the counterclaim in Texas, Pennington filed suit to enforce the Kadish guaranty in a New York state court.

Kadish filed suits against Aztex and Balkhouse for declaratory judgments, and those suits were consolidated with the Pennington action. Aztex and Balkhouse filed suits similar to Pennington's against Kadish in New York.

Malease Office Corp., Malease 18 Corp., Malease Food Corp., and FF Asset intervened in the Kadish suit as party plaintiffs (collectively, "Kadish" along with Lawrence Kadish), seeking a declaration that they had breached no duties to Pennington.

Some eight months after Kadish sued Pennington, and after Pennington filed its own counterclaim for declaratory relief and engaged in discovery in the Texas suit, Pennington filed a motion to dismiss the Texas suit for lack of subject matter jurisdiction. Aztex and Balkhouse sought to abate the Texas suit based on the pendency of the New York litigation. The trial court sustained Pennington's plea to the jurisdiction and dismissed Kadish's suit with an order that stated:

> Defendant's Plea to the Jurisdiction is GRANTED. The consolidated Action is hereby DISMISSED. Plaintiff's request to amend his pleadings is DENIED.

After the court granted Pennington's motion to dismiss, Pennington nonsuited its counterclaim for declaratory relief.

## Jurisdiction of the Controversy

■ In point of error one and two, Kadish argues the trial court erred in sustaining Pennington's plea to the jurisdiction because the court had jurisdiction over the suit.[1]

■ The Declaratory Judgments Act is a procedural device for deciding cases that are within the court's jurisdiction. *State v. Morales*, 869 S.W.2d 941, 947 (Tex.1994); *Lane v. Baxter Healthcare Corp.*, 905 S.W.2d 39, 41 (Tex.App.—Houston [1st Dist.] 1995, no writ). The Texas Uniform Declaratory Judgments Act (the Act) provides:

> A person interested under a ... written contract or other writings constituting a

---

1. The dissent contends that Pennington's motion was actually a motion for summary judgment. The parties filed motions, responses, briefs, motions for rehearing, and responses to motions for rehearing and not one of these documents mentioned TEX.R.CIV.P. 166a or suggested that Pennington's motion was a motion for summary judgment. The relief requested in Pennington's motion was dismissal, not a summary judgment. The original opinion in this case, authored by the dissenting justice, treated the motion as one to dismiss, not for summary judgment.

contract or whose rights, status, or other legal relations are affected by a ... contract ... may have determined any question of construction or validity arising under the instrument ... [or] contract ... and obtain a declaration of rights, status or other legal relations thereunder.

Tex.Civ.Prac. & Rem.Code Ann. § 37.004(a).

The purpose of a declaratory action is to establish existing rights, status, or other legal relation. *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995); *Republic Ins. Co. v. Davis,* 856 S.W.2d 158, 164 (Tex.1993). The Declaratory Judgments Act is "remedial" only. Tex.Civ.Prac. & Rem. Code Ann. § 37.002(b) (1986); *Bonham State Bank,* 907 S.W.2d at 467.

The Act does not confer additional substantive rights upon parties, nor does it confer additional jurisdiction on courts. *Lane,* 905 S.W.2d at 41. A declaratory judgment is appropriate only if there is a justiciable controversy about the rights and status of the parties and the declaration will resolve the controversy. *Bonham State Bank,* 907 S.W.2d at 467; *Lane,* 905 S.W.2d at 41.

The district courts are vested by statute with authority to render declaratory judgments. *See City of San Antonio v. United Gas Pipe Line Co.,* 354 S.W.2d 217, 222 (Tex.App.—Austin 1962, no writ). Whether a court has subject matter jurisdiction to hear an action for declaratory judgment depends upon whether the underlying controversy falls within the constitutional and statutory jurisdiction of that court. "The provisions of [the Act] authorizing the bringing of suit for a declaratory judgment, do not in any way change the law as to jurisdiction of Texas Courts." *Connor v. Collins,* 378 S.W.2d 133, 134 (Tex.App.—San Antonio 1964, writ dism'd).

The 334th District Court in Harris County, Texas, had subject matter jurisdiction over the underlying controversy—the enforcement of the guaranty—because the amount in controversy was within the jurisdictional limits of the court. Accordingly, the court had subject matter jurisdiction over a declaratory judgment action seeking a determination of the parties' rights under that guaranty. Tex.

Civ.Prac. & Rem.Code Ann. § 37.004; *see Great Am. Ins. Co. v. Sharpstown State Bank,* 422 S.W.2d 787, 789 (Tex.App.—Austin 1968, writ dism'd) (declaratory judgment was proper to resolve issue of validity of surety agreement).

We sustain points of error one and two.

## Acquired Jurisdiction

In point of error three, Kadish argues that Pennington's counterclaim for declaratory relief conferred jurisdiction on the court. In response, Pennington argues that after the court dismissed Kadish's suit, it nonsuited its counterclaim.

The rule of acquired jurisdiction is that "where jurisdiction is once lawfully and properly acquired, no subsequent fact or event in the particular case serves to defeat the jurisdiction." *Dallas ISD v. Porter,* 709 S.W.2d 642, 643 (Tex.1986); *Blake v. Blake,* 725 S.W.2d 797, 799–800 (Tex.App.—Houston [1st Dist.] 1987, no writ). Because this case presents no exception to the rule of acquired jurisdiction, the rule prohibited the trial court from dismissing this case for lack of jurisdiction.

We sustain point of error three. The trial court erred in granting the motion to dismiss.

## Other Points of Error

Because we have sustained points of error that require reversal and remand, it is not necessary for us to address other points that also request remand.

We reverse the judgment of the trial court and remand for further proceedings.

The justices who voted for en banc consideration were HUTSON–DUNN, O'CONNOR, WILSON, ANDELL and TAFT, JJ.

COHEN, MIRABAL and HEDGES, JJ., voted against en banc consideration.

OLIVER–PARROTT, C.J., recused herself and did not vote on the en banc consideration.

O'CONNOR, J., joined by HUTSON–DUNN, WILSON, ANDELL and TAFT, JJ., filed the en banc opinion.

HEDGES, J., dissents.

The original panel to which this case was submitted was composed of DUGGAN [2], O'CONNOR and HEDGES, JJ.

MIRABAL, J., did not participate in the en banc opinion.

HEDGES, Justice, dissenting on rehearing.

Pennington filed a motion entitled "plea to the jurisdiction" in the Texas declaratory judgment action, urging that the suit be dismissed for failure of subject matter jurisdiction. The majority cannot get past the style of the motion.

"The legal effect of a pleading in Texas is not determined by its style or name, but by its contentions and purpose." *Guerrero v. Standard Alloys Mfg. Co.*, 598 S.W.2d 656, 657 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.); *accord Hodge v. Smith*, 856 S.W.2d 212, 214 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Although it is styled "plea to the jurisdiction," this motion is in substance a motion for summary judgment based on the trial court's lack of authority to hear the case premised on Kadish's unauthorized use of the Declaratory Judgment Act. Tex.R.Civ.P. 71; *see Nichols v. Prejean*, 673 S.W.2d 394, 396 (Tex.App.—Tyler 1984, no writ) (holding that "[t]he styling of the plea is not controlling," and treating a pleading styled "Plea in Abatement" as a plea to the jurisdiction). Clearly, this issue is a question of law appropriate for summary judgment disposition.

The majority opinion is a textbook example of elevating form over substance. I would treat the motion as a motion for summary judgment.

Furthermore, we can reform the trial court's judgment to reflect a grant of a motion for summary judgment rather than a grant of a plea to the jurisdiction. Texas Rule of Appellate Procedure 80 allows us to "modify the judgment of the court below by correcting or reforming it[.]" Tex.R.App.P. 80(b)(2). Courts of appeals do this when the situation warrants. *See, e.g., Harris County Mun. Util. Dist. No. 48 v. Mitchell*, 915 S.W.2d 859 (Tex.App.—Houston [1st Dist.], 1995, n.w.h.). We should do it here.

The real issue here is whether a declaratory judgment was appropriate in this case. To reverse the trial court's judgment based on the style of the motion is the height of absurdity. It is doubtful that the parties will recognize their own case since they argued the merits both at the trial court level and on appeal, not an irremediable technical flaw.

I would reform the trial court's judgment, and as reformed, affirm.

---

**2.** Justice Duggan, who retired on December 31, 1994, continues to sit by assignment for the disposition of this case, which was submitted before his retirement.